UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY T. ERIKSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:05CV1434 CDP |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §405(g) for judicial review of the

Commissioner's final decision denying Plaintiff Anthony T. Eriksen's application

for disability insurance benefits under Title II of the Social Security Act (the "Act"),

42 U.S.C. §§ 401 et seq. Eriksen claims that he is disabled because he suffers from

depression, fibromyalgia, a back impairment, a sleep disorder, hypertension,

migraine headaches, and post traumatic stress disorder. The Administrative Law

Judge, however, found that Eriksen was not disabled. Because I find that the

decision denying benefits was supported by substantial evidence, I will affirm the

decision.

1

## Procedural History

On December 16, 2003, Eriksen filed an application for Disability Insurance Benefits pursuant to Title II of the Act. Eriksen alleged disability since October 16, 2003 due to fibromyalgia, depression, anxiety, a reduction in his concentration and memory abilities and a sleep disorder. The application was denied initially on May 11, 2004. Eriksen requested a hearing[1] which was held on January 10, 2005. The ALJ determined that Eriksen was not disabled. On August 16, 2005, the Appeals Council denied Eriksen's Request for Review. Thus, the decision of the ALJ stands as the final determination of the Commissioner.

## Evidence Before the Administrative Law Judge

Eriksen was 43 years old at the time of the hearing, and testified that he was 5'7 and around 155 pounds. Eriksen testified that he has completed eleven years of school. Eriksen began his career in Chicago, working at various companies doing mainly factory assembly work. In October 2002, Eriksen moved to St. Louis to be closer to his girlfriend, whom he married in November 2003. Eriksen testified that within two or three months of moving to St. Louis, he was able to obtain a job

---

[1] Missouri is one of several test states participating in modifications of the disability determination procedures applicable to this case. See C.F.R §§404.906; 404.966 (2005). These modifications include the elimination of the reconsideration step and, in some cases, the Appeals Council review step in the administrative appeals process. See id. Therefore, plaintiff's appeal in this case proceeded directly from his initial denial to the ALJ level.

working on an assembly line at a St. Louis company, Vision Tech. Within eleven months, however, he was laid off from this position. Eriksen testified that he was laid off as part of a general business downturn and not as a result of his disabilities.

Eriksen indicated that his worsening condition began after he fell in January 2000. After that fall he began experiencing pain from his neck down through the right side of his upper and lower back. Eriksen testified that he believes this pain is caused by bulging disks in his lower back which have damaged his sciatic nerve. He testified that his back pain prohibits him from lifting any heavy items. Eriksen stated that even carrying a gallon of milk or a heavy grocery bag causes him significant pain. Further, Eriksen testified that his back pain prevents him from sitting down for long periods of time. In his disability report, Eriksen stated that he must stand every 10 minutes due to his back pain. As a result, he stated that he is unable to drive, although he is able to take public transportation. To treat this condition, Eriksen testified that he takes Carisoprodol (Soma). In responding to the Commissioner's Pain Questionnaire, however, Eriksen stated that this medication does not totally relieve his pain.

Eriksen also testified that he suffers from osteoarthritis. He stated that this condition causes severe pain in both his knees and his ankles. Consequently, Eriksen stated that he has difficulty standing or walking. Eriksen testified that he

can only walk for 15 minutes before the pain becomes too great for him to continue. Eriksen testified that his doctor recommended he get a cane to assist his walking, but that he did not have the money to buy one. In the Commissioner's "Pain Questionnaire" Eriksen stated that the combination of his osteoarthritis and his sciatic nerve damage results in sharp, aching and throbbing pain when he bends down, sits or stands.

Eriksen also testified that he has pain in his shoulder, shoulder blades and neck. Eriksen stated that these symptoms have been diagnosed as fibromyalgia. In the "Pain Questionnaire", Eriksen stated that this condition causes sharp pain when he turns his neck and when he raises his arms out or above his head. Eriksen testified that he is taking Proxicam for this condition.

In his "Application for Benefits", Eriksen stated that he has had difficulty staying asleep since January 2000. In his testimony, Eriksen stated that as a result of this sleep disorder he wakes up feeling exhausted every day. Eriksen stated that according to a sleep study, the cause of this condition is that he has too many dreams. Eriksen stated that he has sought medication to resolve this situation. However, he testified that none of the medications he had tried at the time of the hearing had resolved his symptoms.

Eriksen also testified that he had suffered from migraine headaches since 2001. Eriksen stated that these migraines occur about twice a month. When he suffers from migraines, he takes Imitrex and must lie in a dark, quiet room for half an hour to forty-five minutes.

Eriksen's final physical complaint is that he has high blood pressure. As a result of this condition, he has had dizzy spells. Eriksen stated that he was taking Atenolol to treat his high blood pressure.

In addition to his physical problems, Eriksen testified that he suffers from psychological problems. The most significant problem according to Eriksen is post-traumatic stress disorder. Eriksen testified that as a child he had an alcoholic stepfather who beat him, his brother and his mother. Eriksen stated that as a result he has tremors, especially when he is in public. Eriksen testified that around three times a month these tremors will culminate in a panic attack. When he suffers from a panic attack, he feels a compelling need to leave the area he is at and to be alone. Additionally, Eriksen stated that his skin gets clammy and he gets short of breath during these attacks. Eriksen testified that these attacks tend to last from one to three hours. Eriksen stated that while he has not received psychiatric therapy or been hospitalized for this condition, an osteopathic physician diagnosed the condition as post-traumatic stress disorder and prescribed Effexor to treat it.

Eriksen also testified that his memory and concentration skills have deteriorated since 2002.  As a result, Eriksen stated that he has difficulty taking care of himself.  Eriksen testified that his wife must remind him to shave, and to take his medication.  Additionally, in his "Application for Benefits," Eriksen stated that he has trouble remembering verbal instructions and concentrating on written instructions.  While Eriksen's testimony did not mention depression, his "Application for Benefits" attributed some of these difficulties to depression.  In his application, Eriksen stated that he shaves less and usually wears a sweatshirt and sweatpants, because of his depression.  Eriksen also stated that as a result of his depression he spends most of the day sleeping.

Eriksen testified that these physical and psychological problems make it difficult for him to perform everyday tasks.  Additionally, he stated that he is dependent on his wife to help groom himself and take care of everyday chores.

## Medical Records

Eriksen saw Edward Leahy, M.D. four months after moving to St. Louis, in February 2003.  In his first meeting on February 5, Eriksen complained that he had trouble staying asleep.  Eriksen also noted to Dr. Leahy at that time that he was always depressed, had lots of body aches and felt very reclusive.  Dr. Leahy also noted that Eriksen had excessive tremors during his examination.  Dr. Leahy

prescribed Lexapro to treat the depression.

Dr. Leahy also referred Eriksen to the DePaul Health Center for X-rays of his spine. The X-rays showed mild cervical kyphosis, a bowing of the spine, but they did not show any complicating factors. In a follow up with Dr. Leahy, Eriksen noted that the Lexapro had begun to have an effect. Eriksen stated that he felt less reclusive, and Dr. Leahy noted that he seemed more cheerful. However, Eriksen reported that he was still having a difficult time sleeping.

Through July 2003, Eriksen saw Dr. Leahy three times. Overall the findings were that with medication his headaches were less frequent and severe, and his depression, tremors and pain were lessened. However, Eriksen complained that medication did not solve his sleep disorder. As a result, he always felt tired and had absolutely no energy. Dr. Leahy was concerned about the possibility of sleep apnea and ordered a sleep study to be completed by the DePaul Sleep Center.

Anthony Massi, M.D. conducted the study for the DePaul Sleep Center, and found that Eriksen suffered from mild intermittent snoring but otherwise did not have any signs of sleep apnea. Further, Dr. Massi found no other medical evidence of sleep related problems. The study reported sleep state misperception, in that while Eriksen claimed to have slept for less than three hours that night, he actually had slept for 6.9 hours, with normal sleep patterns.

On September 8, 2003, Dr. Leahy changed Eriksen's medication from Lexapro to Celexa. Two weeks later, Eriksen saw Nurse Practitioner Cindy Parker in Dr. Knapp's office, for a fifteen-minute consultative session. Eriksen complained of cervalgia (chronic neck pain), shoulder pain, fatigue during the daytime and intermittent numbness and tingling. The physical examination found that Eriksen had tightness and point tenderness on the left side of his neck (specifically the sternocleidomastoid and trapezius). The physical exam also found that he had a limited range of movement of his neck. Ms. Parker diagnosed Eriksen's problems as fibromyalgia, and ordered blood tests to determine if Eriksen had arthritis. Those tests were negative for rheumatoid arthritis. Ms. Parker gave Eriksen Skelaxin, Vioxx, and Wellbutrin samples to treat his symptoms.

On October 14, 2003, Eriksen visited Ms. Parker for a checkup. During this fifteen-minute consultation, Eriksen complained that he was continually tired, and still suffered from upper body aches in his neck, shoulder and arms. He did, however, note that he felt a little more energetic than he did in his examination two weeks previous. Ms. Parker noted in her assessment that Eriksen suffered from fatigue and multiple myalgias (muscle pain). She raised his Wellbutrin prescription, raised his Vioxx prescription and maintained his Amitriptyline prescription.

One month later, Eriksen saw Ms. Perkins for a follow up. He noted that the Vioxx had helped with all of his muscular aches. He also noted that his sleeping had improved. However, Eriksen also stated that he still suffered from neck pain and still felt very tired during the day. Ms. Parker also noted that Eriksen discussed the physical abuse he suffered as a child by his father. Eriksen told Ms. Parker at that time that he had gone to counseling previously. Ms. Parker then diagnosed Eriksen as suffering from Fibromyalgia, a sleeping disorder, depression, anxiety and post-traumatic stress disorder. She continued his prescription for both Amitriptyline and Vioxx. Additionally she started Eriksen on Effexor for his depression.

On December 16, 2003, Eriksen saw Stephen Knapp, D.O., for whom Ms. Parker worked. During his examination, Eriksen reported to Dr. Knapp that he was having 'weird dreams' which made it difficult for him to sleep. Eriksen also reported that he had stopped taking Effexor, a depression medication, and as a result was feeling very anxious. Dr. Knapp prescribed BuSpar to treat the anxiety that Eriksen complained of, and also increased his prescription of Amitriptyline to treat the sleep disorder.

Three days later, Eriksen visited Ms. Parker for a twenty-two minute followup appointment. Eriksen stated that he was sleeping better, but stated that he was suffering from 'weird dreams' since he increased his Amitriptyline prescription.

He also noted that his hands still trembled. Further, he stated that he had only started on the BuSpar the day before. Ms. Parker increased his prescription of BuSpar and continued Eriksen's Amitriptyline prescription.

The next month, on January 22, 2004, Eriksen visited Ms. Parker for a fifteen minute follow-up consultation. He noted that since he had stopped taking Effexor he felt shaky and dizzy. From the medical chart it appears that Eriksen initially told Ms. Parker that he had run out of Effexor and later during the session told her that he had not run out but had voluntarily stopped. Also, Eriksen noted that pain caused by his fibromyalgia had increased since he ran out of Vioxx samples. Ms. Parker associated the tremors and dizziness with drug withdrawal symptoms, and recommended that Eriksen get back on Effexor. She also continued his prescription for Amitriptyline and added Flexoril to relieve his pain from the fibromyalgia.

Following his hearing, Eriksen underwent a physical consultative examination by Sarwath Battacharya, M.D. on March 29, 2004. Dr. Battacharya's physical examination found tenderness in Eriksen's neck, upper and lower back. Further, Dr. Battacharya found that Eriksen had a limited range of motion in his neck, shoulders and back. However, Dr. Battacharya also noted that Eriksen walked with a normal gait and had very little difficulty getting up and down from the exam table. Dr. Battacharya's clinical impression was that Eriksen suffered from fibromyalgia with

constant pain in his neck, shoulders and upper back.  However, Dr. Battacharya stated that Eriksen did not appear to be in any acute distress.  Dr. Battacharya's examination also found that Eriksen's blood pressure was elevated the day of his examination.

On the same day, Eriksen also underwent a psychological consultation by Georgia Jones, M.D.  Dr. Jones noted that Eriksen walked, moved and sat very rigidly, guardedly and slowly.  Additionally, Eriksen had a blunted facial expression and psychomotor retardation.  Eriksen was shaking somewhat, especially in his hands.  Dr. Jones noted that Eriksen had a decreased quantity, quality and productivity in his speech.  However he did not have any preoccupations, thought disturbances, perceptual distortions, delusions, hallucinations, or suicidal or homicidal ideation.  Eriksen performed relatively well during her mental status exam, although he did perform slowly.  Dr. Jones concluded that Eriksen suffered from major affective disorder, post-traumatic stress syndrome, and panic disorder. She also noted that Eriksen's medical history noted migraines and fibromyalgia.  Dr. Jones concluded that Eriksen had psychological stressors including chronic pain and financial stress.  Her prognosis was guarded, and she stated his condition would improve with psychiatric intervention.

A "Physical Residual Functional Capacity" checklist was completed by non-examining physician John Raabe, M.D. on May 6, 2004. Dr. Raabe noted that the primary diagnosis was fibromyalgia with mild cervical kyphosis. He determined that Eriksen should be able to lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently. Dr. Raabe found no restriction in Eriksen's ability to stand, walk, or sit.

A "Psychiatric Review Technique" form was completed by non-examining psychologist Judith McGee, PhD on May 10, 2004. Dr. McGee indicated that Eriksen suffered from depression and an anxiety disorder. While Dr. McGee found that Eriksen satisfied the symptom requirements of these disorders she did not find that he had any marked or extreme limitations in his functional abilities. Instead, she found only that Eriksen had a mild difficulty in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. Dr. McGee concluded that Eriksen retained the ability for simple repetitive tasks with intact social functioning.

Dr. McGee also completed a "Mental Residual Functional Capacity Assessment." Dr. McGee found that Eriksen was moderately limited in his ability to understand and remember and carry out detailed instructions, and moderately limited in his ability to maintain attention and concentration for extended periods.

Dr. McGee did not find any marked or extreme limitations. Dr. McGee concluded that Eriksen retained the ability to perform simple repetitive tasks, maintain appropriate social work-setting relationships and adapt to routine change.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d. 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, Id. , or because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)(quoting, Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider: (1)

the credibility findings made by the Administrative Law Judge; (2) the education, background, work history, and age of the claimant; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question. Brand v. Secretary of Dep't. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the Act as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is entitled to benefits on the basis of disability, the Commissioner must evaluate the claim using a five-step procedure. 20 C.F.R. §§ 404.1520, 416.920.

First, the Commissioner must decide whether the claimant is engaged in substantial gainful activity. If the claimant is engaged in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe, medically determinable, impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner will review the application further to see if that impairment meets, medically equals, or functionally exceeds those set forth in the "Listing of Impairments" contained in 20 C.F.R. pt. 404, subpt. P, app. 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the claimant does not have such an impairment, the Commissioner reviews whether the impairment prevents the claimant from doing past relevant work. Past relevant work is substantial gainful activity that lasted long enough for the claimant to learn it and was performed in the last 15 years. 20 C.F.R. §§ 404.1520(d); 20 C.F.R., pt. 404, subpt. P., app.1. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If the claimant has met the burden of production and persuasion for the first four steps of this process, the burden of production shifts to the Commissioner to prove that

other work which the claimant can perform is available in the national economy. If the Social Security Administration cannot meet this burden, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the Commissioner is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

Id. at 1322.

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. Singh, 222 F.3d at 451. A treating physician's

opinion concerning a claimant's impairment will be granted controlling weight, if the

opinion is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the record.

Id.  While a treating physician's opinion is usually entitled to great weight, it is the

ALJ's function to resolve conflicts among the opinions of various treating and

examining physicians. Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir.1996). The

Eighth Circuit has upheld an ALJ's decision to reject the conclusions of any medical

expert, whether hired by the claimant or the government, if they are inconsistent

with the record as a whole. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir.1995).  In

any event, whether the ALJ grants a physician's opinion substantial or little weight,

the regulations require the ALJ to "always give good reasons" for the particular

weight the ALJ chooses to give the opinion.  Singh, 222 F.3d at 452; Prosch, 201

F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

## The ALJ's Findings

The ALJ found that Eriksen was not disabled, considering his age,

educational background, work experience and residual functional capacity.

However, the ALJ found that Eriksen has a combination of depression,

fibromyalgia, a back impairment, a sleep disorder and hypertension, which limited

Eriksen's ability to do basic work activity. The ALJ concluded that these limitations do not meet, medically equal or functionally exceed an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.

The ALJ found that Eriksen's allegations were not entirely credible and conflicted with the medical evidence. The ALJ concluded that, giving Eriksen the benefit of the doubt, he could perform medium work activities as long as: (1) it does not require standing or walking more than six hours a day; (2) it does not require sitting more than six hours a day; and (3) it does not require the lifting or carrying of more than 50 pounds occasionally, or (4) it does not require the lifting or carrying of more than 25 pounds frequently.

The ALJ found that these limitations do not prevent Eriksen from performing his past relevant work experience as an assembly worker. Additionally, the ALJ found that Eriksen's residual functional capacity allowed him to perform a significant number of jobs in the local and national economy. The ALJ concluded that Eriksen was not under a disability at any time before the decision.

## Discussion

On appeal, Eriksen argues that the ALJ failed to properly consider all of his medically determinable impairments. Further, Eriksen alleges that the ALJ did not

point to medical evidence to support his conclusion that Eriksen could perform

medium work. Eriksen also argues that the ALJ failed to ensure that the record was

fully and fairly developed. Eriksen also claims that the ALJ wrongly decided that

his allegations were not credible. As a result of one or more of these allegations,

Eriksen contends that the ALJ improperly determined his residual functional

capacity. Additionally, Eriksen argues that the ALJ erred at step four of the analysis

in finding that Eriksen was able to perform his past relevant work experience.

Lastly, Eriksen argues that the ALJ erred at step five of the analysis in finding that

he was capable of performing a significant number of jobs in the local and national

economy.

Eriksen argues that the ALJ erred in determining his RFC, at step four of the

analysis, because the ALJ failed to fully consider the evidence of the record.

Residual functional capacity "is the most [a person] can still do despite [his]

limitations." 20 C.F.R. §§404.1545, 416.945. This determination turns on "all of

the relevant medical and other evidence," including statements from the claimant.

Id. This evidence includes: (1) the claimant's daily activities; (2) the location,

duration, frequency, and intensity of the claimant's pain or other symptoms; (3)

precipitating and aggravating factors; (4) the type, dosage, effectiveness and side

effects of any medication the claimant takes to alleviate his or her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; (6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. <u>Polaski</u>, 739 F.2d at 1321-22; 20 C.F.R. §§404.1529, 416.929.

Eriksen first argues that the ALJ failed to properly consider all of his non-exertional medically determinable impairments in determining his RFC. Eriksen asserts that both his treating physician Dr. Knapp and an examining physician Dr. Jones found that he suffered from post-traumatic stress disorder. Further Eriksen asserts that both Dr. Knapp and an examining physician, Dr. Bhattacharya, found that he suffered from migraine headaches. Eriksen bears the burden of establishing that these impairments are severe. <u>Williams v. Sullivan</u>, 960 F.2d 86, 88 (8th Cir.1992).

The ALJ addressed both of these alleged impairments and found they were not severe impairments supported by objective medical evidence. Eriksen correctly asserts that a treating physician's opinion concerning a claimant's impairment

ordinarily will be granted controlling weight, if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Singh, 222 F3d at 451. In general, the amount of weight given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors. Shontos v. Barnhart 328 F.3d 418, 426 (8th Cir. 2003). However, Eriksen's assertion that his treating physician diagnosed him with PTSD is incorrect. The record indicates that Eriksen was diagnosed with PTSD by Nurse Practitioner Cindy Parker, who worked for Dr. Knapp, during a fifteen-minute consultation in September 2003[2]. As the record does not indicate that Nurse Practitioner Parker has a specialization in psychology, nor were any objective medical tests done, nor treatment for the condition given, this court cannot find that the ALJ should have given her opinion controlling weight.

Eriksen also correctly states that examining physician Dr. Jones indicated that he suffered from post-traumatic stress disorder. The Eighth Circuit has upheld an

---

[2] The law is unclear as to whether a Nurse Practitioner's opinion constitutes an acceptable medical authority in the Eighth Circuit. Compare Shontos v. Barnhart 328 F.3d 418, 426 (8th Cir. 2003) (stating that Nurse Practitioners opinions are acceptable evidence of an impairment) with Hensley v. Barnhart 352 F.3d 353, 356 (8th Cir. 2003) (stating that Nurse Practitioner's opinions are not acceptable evidence of an impairment). However, as 20 C.F.R. § 404.1513(a) lists Nurse Practitioners as an example of "other" acceptable medical sources, this court will consider her opinion.

ALJ's decision to reject the conclusions of any medical expert if they are inconsistent with the record as a whole. <u>Bentley</u>, 52 F.3d at 786. However, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. <u>Singh</u>, 222 F.3d at 452; <u>Prosch</u>, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In this case the ALJ stated that evidence in the record contradicted a finding of a severe mental impairment. The ALJ specifically stated that Eriksen's ability to find a girlfriend, maintain that relationship, and get married within one month of his alleged disability onset date, precluded a finding of a severe mental impairment. Further the ALJ correctly stated that Dr. Jones' report indicated that any mental impairment Eriksen did suffer from could be controlled by treatment and would improve with psychiatric intervention. As any mental impairment that Eriksen may suffer from can be controlled by treatment, it cannot be considered disabling. <u>See Brown v. Barnhart</u>, 390 F.3d 535, 540 (8th Cir. 2004).

Eriksen also asserts that the ALJ failed to properly find that he suffered from severe migraine headaches. Eriksen testified that he suffers from migraine headaches twice a month. Further, Eriksen testified that if he takes medication the headaches last for half an hour to forty-five minutes. Eriksen failed to show that this

impairment is severe, that is, that it has more than a minimal effect on his ability to perform work related activities.  See Nguyen v. Chater, 75 F.3d 429, 431.

Eriksen next argues that the ALJ failed to point to medical evidence which would support the conclusion that Eriksen could perform medium work activity. When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments.  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  Although "[s]ome medical evidence must support the determination of the claimant's RFC, . . . the ALJ is not limited to considering [only the] medical evidence."  Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir.2004).  Rather, in assessing the claimant's RFC, an ALJ must consider all the record evidence. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.2000).  Finally, where the medical evidence is equally balanced, the ALJ resolves the conflict.  Bentley, 52 F.3d at 787.

Eriksen claims that the ALJ erred by failing to accord significant, if not controlling weight, to a "Physical Residual Capacity Assessment" performed by non-examining physician,  Dr. Raabe.  That assessment found that Eriksen was capable of lifting 20 pounds occasionally or 10 pounds frequently.  This finding was based on x-rays of Eriksen's spine which revealed "only mild kyphosis".  There

were no limitations in Eriksen's ability to walk or sit. The ALJ is not bound by a residual functional capacity checklist created by a non-treating, non-examining physician. <u>Taylor v. Chater</u>, 118 F.3d 1274, 1279 (8th Cir. 1997). In this case, the ALJ did not totally discount Dr. Raabe's assessment of Eriksen's ability to work. He found that the objective findings of mild cervical kyphosis and tenderness in his back and shoulders did limit Eriksen's ability to perform work. However, he found that the evidence of the record indicated that Eriksen could lift 50 pounds occasionally or 25 pounds frequently.

In addition to the objective medical evidence, the ALJ also considered other evidence on the record in making his determination. Eriksen claimed his back pain started in January 2000, yet he continued to work until 2003. Further, Eriksen left his last job because he was laid off, not because of any physical disability. As Eriksen stated that at his last job he was required to lift 40 pounds occasionally, the ALJ found that Eriksen could lift more weight than Dr. Raabe's assessment indicated. Further, the ALJ noted that Eriksen told his treating physician, Dr. Knapp that his pain had improved with prescription medicine. <u>See Brown</u>, 390 F3d at 540 (an impairment controllable by treatment cannot be considered disabling). Finally, the ALJ noted that none of the doctors who examined Eriksen found that he was disabled or imposed limitations on his abilities. In fact, in November of 2004, Dr.

Knapp, his treating physician declined Eriksen's request for a handicap sticker. <u>See</u>
<u>Young v. Apfel</u>, 221 F3d 1065, 1069 (8th Cir. 2000) (lack of significant restrictions
imposed by treating physicians support ALJ's decision of no disability).

Eriksen also claims the ALJ erred in finding Eriksen's mental limitations were
not severe. Eriksen asserts that non-examining psychiatrist, Dr. McGee, is the only
mental health expert who offered an opinion regarding Eriksen's work related
mental limitations. In a "Psychiatric Review Form", Dr. McGee found that Eriksen
suffered from depression and anxiety disorder. She categorized the disorders as
imposing "moderate" difficulties in Eriksen's ability to maintain concentration,
persistence or pace and "mild" limitations on his daily living activities and social
functioning capabilities. Further, she noted no repeated episodes of prolonged
decompensation.

It is appropriate for the ALJ to take a "functional approach" when
determining whether impairments amount to a disability. <u>Bowen v. Yuckert</u>, 482
U.S. 137, 146 (1987). That a claimant has medically-documented impairments does
not necessarily result in a finding of disability. <u>See</u> <u>Brown v. Chater</u>, 87 F.3d 963,
964 (8th Cir.1996). The ALJ should consider "all the evidence in the record" in
determining RFC, including "the medical records, observations of treating

physicians and others, and an individual's own description of his limitations."

Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing McKinney v.

Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). If, in light of all the evidence, "the

impairments are not severe enough to limit significantly the claimant's ability to

perform most jobs, by definition the impairment does not prevent the claimant from

engaging in any substantial gainful activity." Bowen, 482 U.S. at 146.

There is substantial evidence to support the ALJ's determination that

Eriksen's mental limitations were not severe.  First, Dr. McGee did not find that

Eriksen had a "marked" or "extreme" limitation in any functional area.  Further, she

concluded that Eriksen retained the ability for simple repetitive tasks and had intact

social functioning.  Therefore, even had the ALJ given great weight to Dr. McGee's

opinion, he would not be compelled to find that Eriksen suffered from severe

functional limitations as a result of mental deficiencies.  Second, the ALJ noted that

Eriksen had also been examined by Dr. Jones.  Dr. Jones gave him a Global

Assessment of Functioning score of 65.  A GAF score of 65 indicates only mild

mental impairments.  Further, Dr. Jones noted that his mental symptoms would

improve with treatment.  However, even after being examined by Dr. Jones, Eriksen

still did not seek mental health care.  In addition, Eriksen voluntarily stopped taking

Effexor, which was prescribed by Ms. Parker to treat his depression. The Eighth

Circuit has repeatedly held that a failure to take psychiatric medication or seek psychiatric treatment is a proper basis for an ALJ to discount psychiatric complaints. See Roth v. Shalala, 45 F.3d 279, 283 (8th Cir. 1995); Roberts v. Apfel 222 F.3d 466 (8th Cir. 2000).

Eriksen also argues that the ALJ failed in his duty to ensure the record was fully and fairly developed. Specifically, Eriksen argues that the ALJ was duty-bound to develop the record by asking the treating and examining physicians for more information than they had provided. The ALJ's duty to develop the record, however, does not extend so far. As the social security disability hearing is non-adversarial, the ALJ has a duty to develop the record independent of the claimant's burden in the case. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir.2004). The ALJ must neutrally develop the facts. Id. He does not, however, have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Id. at 839. In this case, the ALJ made no mention of any crucial issue he felt was undeveloped. In fact, Eriksen's medical record contains the opinions and notes of eight medical experts. As there is ample objective medical evidence available in this case, I cannot say that the ALJ had a duty to further develop the record.

Eriksen next argues that the ALJ erred in his credibility determination of Eriksen's subjective complaints. Although the ALJ may discount a claimant's subjective complaints, he may not do so on the sole ground that those complaints are not fully supported by the objective medical evidence. Jeffery v. Secretary of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Spradling v Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Battles, 902 F.2d at 660. Thus in assessing subjective allegations, the ALJ may consider the frequency and type of the claimant's medication or treatment, the claimant's daily activities, and the claimant's appearance and demeanor at the hearing. Jones v Chater, 86 F.3d 823, 826 (8th Cir. 1996); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination using the factors set forth in Polaski 739 F.2d at 1330, See supra;  Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Under Polaski, an ALJ may discount a claimant's subjective complaints when he explicitly finds them inconsistent with the daily activities of the claimant, lack of treatment, demeanor, and objective medical evidence. Long v. Bowen, 866 F.2d 1066 (8th Cir. 1989); Jones v. Chater, 86 F.3d

823, 826 (8th Cir. 1996). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered the relevant evidence. Jeffery, 849 F.2d at 1132; Butler v. Secretary of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).

The ALJ reviewed the evidence and found Eriksen's subjective complaints of psychological disability to be inconsistent with the record as a whole. The main reason the ALJ discredited Eriksen's testimony regarding the severity of his mental symptoms was that his stated symptoms of debilitating anxiety and panic attacks conflicted with both his activities and the medical evidence. For example, the ALJ noted that Eriksen was married in November of 2003, after his alleged onset date. Yet, neither the medical records nor Eriksen's testimony indicate that Eriksen suffered from any anxiety-related problems during this stressful time period. The ALJ further noted that it is unlikely that someone who suffered from a debilitating psychological condition would be able to socialize enough to find a girlfriend, be married within one month of his alleged onset date, and have the social skills to maintain that relationship. The ALJ also noted that the record showed that Eriksen did not suffer from extended periods of deterioration or decompensation in his previous employment. In fact, Eriksen testified that he was laid off because of a general business slow down and not because of any psychological disability.

Further, Dr. Jones indicated that Eriksen was only moderately impaired and did not have any significant functional limitations. The ALJ noted that in fact, none of the medical experts ever found or imposed any significant mental limitations on Eriksen's functional capacity. Just as a treating physician's opinion must, in general, be given "substantial" weight in determining a claimant's disability status, the absence of any document concluding Eriksen is disabled in the record, as here, tends to weigh against a finding favorable to the claimant. Buress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998). Finally, the ALJ stated that Eriksen's failure to seek treatment from a mental health professional discouraged a finding that Eriksen was disabled. Roberts, 222 F.3d at 466.

Eriksen also complained of fibromyalgia, back pain and hypertension. The ALJ found that Eriksen was not entirely credible in his allegations of the severity of these conditions. The ALJ may discount the claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence. Hutsell v Sullivan, 892 F.2d 747, 750 (8th Cir. 1989)(citing Long v. Bowen, 866 F.2d 1066, 1067 (8th Cir.1989)). See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir.1990) ("If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment").

The ALJ looked at the objective medical evidence including both x-rays taken of Eriksen's back and clinical evaluations by his treating and consulting physicians. The ALJ noted that Eriksen's x-rays only showed a mild cervical kyphosis and that he suffered from no strength or motion limitations as a result of his condition. Further, the ALJ stated that Eriksen's medical records do not show that he received much ongoing treatment for his back. The ALJ stated that this lack of seeking treatment undermines the credibility of a disabling back impairment. See e.g., Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987) (when determining a claimant's credibility, an ALJ may consider the claimant's failure to seek medical attention); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir.1997) (failure to seek treatment favors against a finding of disability); Wilson v. Chater, 76 F.3d 238, 241 (failure to seek treatment for pain is inconsistent with disabling pain).

The ALJ further found that Eriksen stated that his symptoms were lessened by medication prescribed to him. The ALJ reasoned that if Eriksen were "truly desirous of work" he would not have voluntarily stopped taking this medication. The ALJ properly found that Eriksen's failure to follow prescribed medical treatment for his conditions  undermined the credibility of his testimony that his condition was disabling. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir.1997); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir.1995); Johnson v. Bowen, 866 F.2d 274,

275 (8th Cir.1989); <u>See also</u> 20 C.F.R. § 404.1530.

The ALJ here explained his reasons for determining the credibility of Eriksen's complaints, and I find that his determinations are supported by the record. As the ALJ explicitly discredited Eriksen's testimony and gave good reasons to do so, I will defer to his judgement. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001).

Eriksen next argues that the ALJ's failed to perform a function by function analysis comparing Eriksen's RFC with his previous relevant employment. The ALJ must make specific finding regarding the actual physical and mental limitations, and determine how those limitations affect the claimant's RFC. <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568; <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1238-39 (8th Cir.1991); <u>Lowe v. Apfel</u> 226 F.3d 969, 972 (8th Cir. 2000). In this case the ALJ carefully spelled out the combination of symptoms he found the claimant to have and the physical limitations of the work that Eriksen could perform. This included limiting his activities to lifting 50 pounds occasionally or 25 pounds frequently, and not standing, sitting or walking for more than six hours out of an eight-hour day. Eriksen argues that the ALJ failed to specify any mental limitations to the work he could do. In this case, however, the ALJ did not find that Eriksen had met his burden in proving that he suffered from any severe mental limitations. As such, the

ALJ found that Eriksen only suffered from the physical limitations the ALJ listed and did not suffer from any severe mental limitations.

In addition to defining the claimant's RFC, the ALJ must also make explicit findings regarding the actual physical and mental limitations of the claimant's previous work to determine whether the claimant is capable of performing the relevant tasks. Pfitzner, 169 F.3d at 568; Groeper, 932 F.2d at 1239; Nimick v Secretary of Health & Human Servs., 887 F.2d 864, 866 (8th Cir. 1989). The ALJ may discharge this duty by referring to the specific job descriptions in the *Dictionary of Occupational Titles* that are associated with the claimant's past work. Pfitzner, 169 F.3d at 568; See also Sells v. Shalala, 48 F.3d 1044, 1046. Eriksen argues that the ALJ failed to perform a function by function analysis in comparing his RFC with his past relevant work as an assembly worker. After consulting both the *Dictionary of Occupational Titles* as well as Eriksen's testimony that his past relevant work included lifting only 40 pounds occasionally and standing no more than thee hours a day, the ALJ concluded that Eriksen did not meet his burden of proving that he could not perform his past relevant work.

The ALJ considered the entire record in making his determination that Eriksen could perform his past relevant work experience. The ALJ specifically

found limitations on Eriksen's physical capacity to do work which were based on the record. The ALJ further found that Eriksen was not credible with respect to any severe mental functional disabilities. Substantial evidence on the record shows that given his limitations, Eriksen is capable of performing his past relevant work as an assembly worker. Even if the ALJ should have been more specific in his comparison of Eriksen's RFC and his past relevant work, the 8th Circuit has held that "[a]n arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where ... the deficiency probably ha[s] no practical effect on the outcome of the case." <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987). As the ALJ's findings are supported by substantial evidence in the record, his determination that Eriksen can perform his past relevant work will stand.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of September, 2006.